IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Michael D. Cook, ) | Civil Action No. 6:15-2431-MBS-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

     This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

     The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

     The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on January 10 and 11, 2012, respectively, alleging that he became unable to work on December 25, 2009. The applications were denied initially and on reconsideration by the Social Security Administration. On May 19, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

the plaintiff and Mark Leaptrot, an impartial vocational expert, appeared on August 1, 2013, considered the case *de novo*, and on January 10, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on April 13, 2015.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.

(2)    The claimant has not engaged in substantial gainful activity since December 25, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: Dysfunction Major Joints – Left Knee and Right Shoulder; Disorders of the Spine; and Affective and Anxiety Disorders (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform unskilled work at the light exertional level of work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with occasional climbing ramps or stairs; occasional balancing and stooping; no climbing ladders, ropes, scaffolds; no kneeling, crouching, or crawling; frequent right upper extremity lateral and forward reaching but no right upper extremity overhead reaching; the need to avoid exposure to extreme temperatures, wetness, and humidity, and excessive vibration; the need to avoid exposure to hazards and heights; and, the need to avoid driving. The claimant is able to perform unskilled, low-stress work that is not fast-paced production work; with only occasional changes in the work setting and occasional

decision-making; and, occasional interaction with the public and co-workers.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on December 21, 1973, and was 36 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from December 25, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments

4

which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 36 years old on his alleged disability onset date (December 25, 2009) and was 40 years old on the date of the ALJ's decision (January 10, 2014) (Tr. 19). He has a tenth grade education, performed past work in a motorcycle shop, and has a 26 year history of motorcross racing (Tr. 43, 419).

5

On November 27, 2007, the plaintiff was treated at Terrero Medical Center ("Terrero") in Sunrise, Florida, for a medial meniscus tear after a motorcycle accident from motocross (Tr. 335). He was prescribed Oxycontin, morphine, Xanax, and Oxydose for pain management (Tr. 269-334, 336-39).

On September 16, 2008, Alfredo Terrero, M.D., wrote that the plaintiff had experienced right knee pain for a year, following a motor vehicle accident. He had severe knee pain, and his range of motion was decreased and painful. Narcotics were prescribed after NSAIDs provided no relief (Tr. 297-99). On September 14, 2008, the plaintiff was treated for depression due to his decreased functional status (Tr. 293). On November 10, 2008, the plaintiff reported that he had tried to work as a manager at McDonald's, but his pain interfered with his activities (Tr. 288). The plaintiff was treated throughout 2008 and 2009 with Oxycontin, Roxicodone and Xanax (Tr. 280-82, 317-28, 409).

The plaintiff was admitted to Delray Medical Center in Florida on December 25, 2009, after a motorcycle crash resulted in pneumothorax (collapsed lung), clavicle fracture, and rib fractures (Tr. 342, 345, 352, 356-57). The plaintiff's left knee demonstrated a laceration in the superior aspect of the patellar tendon with a small laceration of the patellar tendon. There was also fluid and inflammation in the lower pelvis interspersed between the distal ileum and adjacent small bowel loops. He arrived at the hospital drowsy with intermittently garbled and clear speech and easily fell asleep (Tr. 346). Radiology studies showed no acute head or spine injury (Tr. 360). The following day, the plaintiff had an exploratory laparotomy and segmental resection of the ileum with primary end-to-end stapled anastomosis with negative biopsies (Tr. 345-54). Upon discharge, he was ambulating about freely and continued taking previously prescribed prescription narcotic pain medications from the previous motorcycle crash knee injury (Tr. 345). The plaintiff continued pain management treatment with Terrero following the accident (Tr. 375-77).

On February 17, 2010, an x-ray of the plaintiff's right shoulder showed a right clavicular fracture with a 1.6cm interior displacement of the distal fracture fragment and 2.5cm overlapping fragments (Tr. 403).

The plaintiff began follow up treatment with Dr. Terrero on October 5, 2011. He reported continued pain in his knees, neck, and right rib cage for approximately one year. His pain was located in the right side of his neck and clavicle. He also had pain in his knees and ribs. The plaintiff had tenderness to palpation from the midpoint of his clavicle to the upper area of the right side. He had decreased and painful range of motion. His knee was tender to palpation over the medial meniscus of the right knee and diffusely throughout the left knee. He had decreased and painful range of motion in his knees. He was diagnosed with pain in his knees, cervicalgia, other nerve root and plexus disorders, anxiety disorder, panic disorder, insomnia, obesity, and exostosis of the jaw (Tr. 339, 386-87). The plaintiff tested positive for THC and was warned he would be discharged if he tested positive again (Tr. 387). He continued to take methadone, oxycodone, Xanax, and naproxen (Tr. 388). It was recommended that the plaintiff remain active, avoid heavy lifting, use heat therapy, physical therapy, chiropractic, acupuncture, and do physical exercises (swimming/ biking/walking) at least five times a week (Tr. 387).

On November 2, 2011, the plaintiff had moderated pitting edema of the knee. He also had neck pain and left clavicle fracture pain. He was prescribed narcotic medications due to the severity and persistence of his pathology (Tr. 377-78). The plaintiff reported an eight out of ten pain level without his narcotic pain medications and a reduced pain level of two out of ten with his medications (Tr. 375, 377), that his pain had decreased, the swelling had gone down, and he could move better (Tr. 382). He noted that he could "do normal things" when taking his medication and was "able to work, socialize and perform daily activities with tolerable level of pain" (Tr. 375). He also reported his anxiety was under control and that he "seldom" had any mood swings (Tr. 377, 394)

On December 23, 2011, the plaintiff was seen for pain in his knees, neck, and right rib cage. Dr. Terrero indicated that the plaintiff's left lower extremity swelling was secondary to venous insufficiency and the plaintiff needed a work-up, but he was uninsured (Tr. 413-16). The plaintiff reported that his pain was under control with medication: two out of ten at rest and a three out of ten during activities, and that he was able to work, socialize, and perform daily activities with a tolerable level of pain (Tr. 413).

The plaintiff was assessed at Atlantic Medical Solutions for chronic right shoulder pain and hand pain on January 17, 2012. It was noted that he had a history of a fractured nondisplaced right clavicle (Tr. 452).

On February 17, 2012, the plaintiff had right knee pain as well as neck, back, and clavicle pain (Tr. 451). He reported improved activities of daily living, reduced pain level, and improved function (Tr. 451-52). The plaintiff was treated monthly in 2012 for chronic shoulder and knee pain (Tr. 426-50). His chronic pain required opioid medications.

On February 20, 2012, Alan Jaffe, Ph.D., conducted a consultative psychological examination during which the plaintiff denied any past or current substance abuse and alleged current panic attacks and depression. The plaintiff reported a ten year history of anxiety but had no mental health treatment history. He was taking Roxicodone, methadone and Xanax (Tr. 419). Dr. Jaffe observed that the plaintiff seemed to be in pain but was fully oriented. The plaintiff reported flashbacks to traumatic experiences with no evidence of perceptual disturbance. His mood was anxious and depressed with mood-congruent affect. The plaintiff's gait was unimpaired but slow. He appeared to be in pain. His psychomotor activity was below average. His auditory attention and concentration appeared below average. His immediate memory processes appeared somewhat impaired. Delayed memory, recent historical memory, and fund of information appeared somewhat below average. His mood appeared anxious and depressed. His socialization appeared impaired. Dr. Jaffe stated that impressions of post-traumatic stress

8

disorder ("PTSD") were supported by the plaintiff's apparent anxiety when discussing traumatic events. Impressions of depression were supported by depressive aspects of his mood and affect and psychomotor slowing. Impressions of depression and anxiety were supported by some impairment in attention, concentration, and memory (Tr. 420-21). Dr. Jaffe assessed PTSD, adjustment disorder with depressed mood, and anxiety disorder. He strongly recommended psychotherapy sessions. The plaintiff appeared to be experiencing symptoms of PTSD on top of a long-standing anxiety disorder. He appeared to be experiencing depressive symptoms due to his physical conditions and associated pain and functional limitations. (Tr. 421). Dr. Jaffe wrote that the plaintiff's psychological difficulties appeared to have significantly affected his functioning over the last year. It was reasonable to project that the impairment would persist for one year's time. He opined that the plaintiff would have difficulty maintaining full-time employment because although his ability to understand and carry out instructions was not impaired, his ability to remember instructions was slightly impaired, his ability to respond appropriately to supervision and co-workers was likely to be impaired, his ability to respond to work pressures was likely significantly impaired, and his ability to perform certain tasks may be affected by his physical conditions (Tr. 422).

Also on February 20, 2012, Lisa Winings, Psy.D., found that the plaintiff had PTSD, adjustment disorder with depressed mood, anxiety, had average insight and abstract thought, below average attention and concentration, average judgment, and impaired socialization (Tr. 81).

On March 7, 2012, Judith E. Myers, Psy.D., found that the plaintiff had no restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. She diagnosed PTSD, adjustment disorder with depressed mood, and anxiety (Tr. 80-81). She

believed the plaintiff had the ability to perform simple, repetitive tasks and higher level tasks with limited social contact (Tr. 85).

Also on March 7, 2012, Elizabeth Huba, S.D.M., opined that the plaintiff occasionally lift and/or carry 20 pounds and frequently lift and/or carry ten pounds. He could stand and/or walk about six hours in an eight-hour workday and could sit for about six hours. He could occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 82-83).

On March 15, 2012, left knee crepitation was noted (Tr. 450). On April 9, 2012, the plaintiff had an assessment for chronic neck and shoulder pain. He was seen on a monthly basis for medication refills (Tr. 449-52).

On April 9, 2012, Ellen Shapiro, Ph.D., conducted a psychiatric review technique assessment and found that the plaintiff had moderate difficulties in maintaining social functioning and moderate difficulties maintaining concentration, persistence, or pace. She noted his reports of panic attacks, intrusive memories of the motorcycle accident, depression, memory problems, and social isolation (Tr. 121). The plaintiff performed limited household chores, prepared simple meals, performed self-care, managed his finances, and had a good relationship with his wife, father, and brother (Tr. 121). Dr. Shapiro found the plaintiff's claims as to his symptoms only partially credible (Tr. 122).

On April 11, 2012, Debra Troiano, M.D., conducted a physical residual functional capacity ("RFC") assessment of the plaintiff and determined that he could occasionally lift/carry 20 pounds, frequently lift/carry ten pounds, stand/walk six hours in an eight-hour workday, sit for six hours in a normal eight-hour workday, and conduct unlimited amounts of pushing and pulling (Tr. 110-12). He could occasionally climb ramps and stairs, balance, kneel, and crouch. He should never climb ladders, ropes, and scaffolds. The plaintiff should avoid even moderate exposure to cold and humidity (Tr. 111-12). Dr.

Troiano noted that the medical records showed the plaintiff had normal gait, full motor skills in all extremities, and pain that was under control with medications (Tr. 111).

On June 26, 2012, the plaintiff reported that his pain level was eight to nine without medication and improved to four to five with medication (Tr. 443).

An MRI of the plaintiff's right arm on April 11, 2013, showed chronic enlargement of the acromioclavicular joint without impingement and with evidence of a healed fracture of the right clavicle (Tr. 468). The plaintiff continued monthly visits with William Ouw, M.D., at the Medical Center of North Broward in Florida, for medication maintenance for his chronic pain through May 13, 2013 (Tr. 425-68).

Vasant Garde, M.D., performed a consultative medical examination of the plaintiff on October 3, 2013 (Tr. 491-94). After reviewing the plaintiff's medical and medication history, Dr. Garde examined him and noted that he was in no acute distress and walked with a normal gait without use of assistive devices (Tr, 492). Range of motion studies showed mild limitations of cervical extension as well as in the right shoulder and left knee but were otherwise within normal limits (Tr. 483). An August 2013 right shoulder x-ray and left knee x-ray showed no abnormality and a normal knee (Tr. 474, 475, 477). The examiner noted an angular deformity in the right mid clavicle with no other deformities observed (Tr. 493). There was no evidence of atrophy or sensory loss (Tr. 493). Dr. Garde reported his clinical impression for chronic right shoulder pain with limitation of abduction; right clavicle deformity; chronic left knee pain; chronic back pain; and history of motorcycle accident with multiple trauma (Tr. 493). Dr. Garde provided responses to a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" wherein he reported the claimant could lift/carry up to ten pounds on any occasion; sit for three hours, stand for four hours or walk for 30 minutes at a time; sit a total of six hours, stand a total of seven hours or walk a total of two hours in an eight hour work day; with no need for a cane; no overhead reaching and only occasional pushing/pulling using the right hand; no limitations in use of

11

the feet; no climbing ladders, ropes or scaffolds; no kneeling, crouching or crawling; and, the need to avoid humidity and wetness, pulmonary irritants, temperature extremes, vibrations, and noise (Tr. 485-90). Dr. Garde noted the plaintiff had limitation of motion in the cervical spine, the right shoulder, and the left knee.(Tr. 485-94).

The plaintiff testified at the administrative hearing that his doctors have treated his pain with OxyContin and his anxiety with Xanax (Tr. 40). The plaintiff now takes Methadone (10 mg) twice a day and Roxicodone (30 mg) six times a day for pain (Tr. 52-53). He stated that his pain medications reduce his pain but do not completely take the pain away (Tr. 53).

The plaintiff testified about the motorcycle accident and said that he broke seven ribs, damaged his right shoulder causing problems reaching out to the right side, and that he has problems urinating with it taking him about 30 minutes two to three times a day (Tr. 45-47, 53-57, 64-65,419). The plaintiff reports problems standing because his left knee is numb and tingles, but said he can stand a total of three hours a day (Tr. 46-49). He stated he has to apply ice or heat to his left knee three times a week. The plaintiff last worked in 2012 for about a month but stopped because he was unable to stand for a three-hour shift. His left knee bothered him. His left knee was completely shattered in the 2008 accident. He had tingling and burning in his left leg. When he laid in bed he had to prop his leg up. He iced his leg and his knee three or four times a week. The plaintiff stated that his injuries caused problems that prevented him for working. The ALJ stated that the records showed a right knee meniscus tear, but the attorney and the plaintiff stated it was the left leg, not the right. The plaintiff did not know the technical term, but it looked like he had a big scoop taken out of his left leg. His leg swelled, and he took water pills and anti-inflammatories. The pills helped but it still swelled. His knee gave him problems if he tried to stand too long. The plaintiff testified he could stand for 30 minutes and then he

would need a 20-minute break.  He said he could stand a total of about three hours throughout the day (Tr. 49-51).

The plaintiff testified that he had pain if he raised his right arm too high.  He could not pick up his son, who weighed 20 pounds, because he was too heavy.  He had pain in his shoulder and his neck.  The plaintiff said that his entire right side, from his butt to his shoulder, felt like it was on fire.  He had been told that it would heal, but it did not.  He most recently complained about the pain to his doctor a few weeks prior to the hearing (Tr. 53-56).  He was right-handed.  He was unable to carry groceries with his right arm.  Even if he sat and leaned on his arm for ten minutes he would need medication for the pain.  He could raise his arm out in front of him, but he could not lift it above his head (Tr. 56-58).

The plaintiff explained that he received a letter from the State of Florida stating that his driver's license had been suspended due to the accident.  The State of Florida asked him to take a form to his surgeon.  His surgeon completed the form, stating that the plaintiff had head trauma, memory loss and was falling asleep.  The plaintiff did not see the actual form, nor was he allowed to have a copy of the form.  The surgeon told him that he wrote that due to his head trauma, his strength, and not being able to turn his neck or grip the steering wheel, that he was recommending that they not give him his license back.  He received a letter stating that he could be reevaluated in five to ten years (Tr. 59-62).

The plaintiff testified that his medications made him tired and forgetful.  He would be in the middle of a conversation and forget what he was talking about.  He fell asleep during the day regularly.  He was fired for sleeping on the job.  He took pain medications when he needed them, but he was still having memory problems and falling asleep. He had a hard time retaining what people told him (Tr. 66-70).

13

## **ANALYSIS**

The plaintiff argues that the ALJ erred by (1) failing to properly assess opinion evidence, and (2) relying on the vocational expert's testimony in response to a hypothetical that differed from the RFC finding (pl. brief 15-18, 18-22).

### *Opinion Evidence*

The plaintiff contends that the ALJ did not properly evaluate the opinions of consultative examiners Drs. Garde and Jaffe.  The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3)  the nature and extent of the treatment relationship; (4)  the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

Dr. Garde performed a consultative medical examination of the plaintiff on October 3, 2013 (Tr. 491-94) and provided responses to a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" wherein he reported the claimant could lift/carry up to ten pounds on any occasion; sit for three hours, stand for four hours or walk for 30 minutes at a time; sit a total of six hours, stand a total of seven hours or walk a total of two hours in an eight hour work day; no need for a cane; no overhead reaching with the right hand, frequent reaching in other directions with the right hand, and only occasional pushing/pulling using the right hand; no limitations in use of the feet; no climbing ladders,

ropes or scaffolds; no kneeling, crouching or crawling; and the need to avoid humidity and wetness, pulmonary irritants, temperature extremes, vibrations, and noise (Tr. 485-90).

First, the ALJ noted that there were no functional evaluations or opinions from any treating sources in the record, and, accordingly, the reports and conclusions from the consultative and the non-examining sources would be "afforded appropriate weight in light of the treating source reports" (Tr. 18).  Other than stating that the weight given to the opinions was "appropriate," the ALJ did not identify the weight accorded to Dr. Garde's opinion of the plaintiff's physical limitations. The ALJ pointed out that the plaintiff's treating sources confirmed a history of treatment for injuries to his ribs, right clavicle, left knee, and back pain; however, at the hearing, when asked why he could not work, the plaintiff claimed he is limited by bowel and bladder problems, but there was no treating or consultative clinical evidence to support his claim (Tr. 18). It is unclear how the plaintiff's testimony about his bowel and bladder issues relates to the validity of Dr. Garde's opinion, as Dr. Garde did not mention any bowel or bladder issues in his examination report (*see* Tr. 485-90).  The ALJ also pointed out that the plaintiff has only experienced mild limitations in his activities of daily living (Tr. 18).

Lastly, the ALJ noted that the plaintiff's assertion that he has not been able to use his right arm for four years was not supported by his treating physicians' records (Tr. 18).  The ALJ did not include Dr. Garde's limitation to occasional pushing/pulling with the right hand in the RFC assessment, but did include the other limitations noted by Dr. Garde in the plaintiff's ability to use his right arm (no overheard reaching with the right hand and frequent lateral and forward reaching with the right hand) (Tr. 14-15; *see* Tr. 487).  The ALJ did not explain why he adopted some of the right hand limitations noted by Dr. Garde but not all. Further, the ALJ did not explain why he rejected Dr. Garde's opinion that the plaintiff could occasionally lift and carry up to ten pounds (Tr. 485).  Rather, the ALJ limited the plaintiff to a range of light work (Tr. 14), which "involves lifting no more than 20 pounds at

a time with frequent lifting or carrying objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). Interestingly, at the conclusion of the assessment of the consultative examiners' opinions, the ALJ stated:

> [I]n affording the claimant reasonable benefit of doubt, despite the treating source reports indicating that he was functioning well and the functional conclusions reported by the consultative examiners, I find it appropriate to limit the claimant to the *sedentary* level as set forth above.

(Tr. 18 (emphasis added)). As noted above, the ALJ did not in fact limit the plaintiff to sedentary work. Given the foregoing issues and the importance of Dr. Garde's opinion since there are no functional evaluations or opinions from any of the plaintiff's treating sources in the record, the undersigned recommends that this case be remanded for further consideration and evaluation of the opinion of Dr. Garde.

Dr. Jaffe performed a consultative psychological examination of the plaintiff on February 20, 2012. Dr. Jaffe opined that the plaintiff would have difficulty maintaining full-time employment because, although his ability to understand and carry out instructions was not impaired, his ability to remember instructions was slightly impaired, his ability to respond appropriately to supervision and co-workers was likely to be impaired, his ability to respond to work pressures was likely significantly impaired, and his ability to perform certain tasks may be affected by his physical conditions (Tr. 418-22).

The ALJ stated that he gave "limited weight" to the opinion of Dr. Jaffe "given the lack of prior mental health complaints and/or treatment as well as the history of narcotic treatment from pain management providers" (Tr. 18) . As argued by the plaintiff, the ALJ did not explain how the narcotic treatment from pain management providers is related to the weight assigned to Dr. Jaffe's opinion. The plaintiff further argues that the ALJ failed to explain why he did not include the limitation that the plaintiff "would have difficulty maintaining competitive employment on a full time basis" in the RFC finding, while he did

include several of the other limitations found by Dr. Jaffe (pl. brief at 22 (citing Tr. 422)).

Statements that a patient is "disabled" or "unable to work" or similar assertions are not

medical opinions.    These are administrative findings reserved for the Commissioner's

determination. SSR 96-5p, 1996 WL 374183, at *5.  Accordingly, the undersigned finds no

error in this regard.    However, given the previous recommendation that the ALJ be

instructed upon remand to further consider and evaluate the opinion of Dr. Garde, the

undersigned further recommends that the ALJ do the same for the opinion of Dr. Jaffe.

### *Vocational Expert Testimony*

The ALJ proposed the following hypothetical to the vocational expert at the

administrative hearing:

> [A]ssume an individual of the claimant's same age, education,
> and work experience; limited to light exertional work; occasional
> posturals such as climbing ramps or stairs, or balancing, or
> stooping; should not kneel, crouch, or crawl; may occasionally
> . . . climb ramps or stairs, balance, and stoop; also couldn't . .
> . claim ladders, ropes, or scaffolds; may frequently reach with
> the right arm, but may never [reach] overhead with the right
> arm; should avoid exposure to extreme temperatures and
> humidity, as well as excessive vibration, hazards, and  heights
> and should avoid driving as part of the job duties; unskilled,
> SVP of 1 and 2, occasional reminders of job tasks and
> occasional interaction with public and coworkers.

(Tr. 74).

The vocational expert testified that the requirement of occasional reminder of

job tasks would only allow for sheltered workshops.  The ALJ asked about the same

hypothetical, but limited the reminder of work tasks to the training period only. The

vocational expert stated that the individual could perform work as a garment sorter, light,

unskilled, SVP of 2, with 6,400 jobs regionally and 280,000 jobs nationally; house sitter,

light, unskilled, SVP of 2, with 1,800 jobs regionally and 71,000 jobs nationally; and office

helper, light, unskilled, SVP of 2, with 12,500 jobs regionally and 185,000 jobs nationally.

The vocational expert testified that an individual that was off task 20% of the time would rule

out all work in the national economy (Tr. 74-76).  In the opinion at step five of the sequential evaluation process, the ALJ concluded, based upon the vocational expert's testimony, that the plaintiff could perform jobs such as sorter, house sitter, and office helper (Tr. 20).

The plaintiff argues that the ALJ's conclusion at step five is not supported by substantial evidence because the hypothetical presented to the vocational expert differs from the RFC finding in several respects (pl. brief at 15-18).  The undersigned agrees. Specifically, in terms of mental restrictions, the hypothetical included a limitation to unskilled work and a restriction to occasional interact with the public and co-workers (Tr. 74). However, the RFC finding included those limitations along with the following additional restrictions: "low stress work that is not fast-paced production work; with only occasional changes in the work setting and occasional decision-making . . ." (Tr. 15).  The Commissioner argues that there is no error because the plaintiff could still perform two of the jobs identified by the vocational expert (house sitter and office helper) if the additional limitations were added in accordance with the RFC finding (def. brief at 12-13). "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989) (") (internal citations omitted).  Here, the vocational expert's testimony was based upon a hypothetical that did not include all of the plaintiff's impairments.  As the undersigned recommends this case be remanded for further consideration and evaluation of the opinions of the consultative examiners, the undersigned further recommends that the case be remanded for further administrative proceedings based upon the ALJ's failure to include all of the plaintiff's impairments in the hypothetical to the vocational expert.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 7, 2016
Greenville, South Carolina